## LAPEER TRAILER CORPORATION v. FRUEHAUF TRAILER CO.

### No. 1913.

District Court, E. D. Michigan, S. D.

June 2, 1930.

See also 24 F.(2d) 595.

Barthel, Flanders & Barthel (by Otto F. Barthel and Ralph S. Binns), all of Detroit, Mich.), Dyrenforth, Lee, Chritton & Wiles (by Russell Wiles), all of Chicago, Ill., and MacKay, Wiley, Streeter, Smith & Tucker (by Arthur M. Smith), all of Detroit, Mich., for plaintiff.

Stuart C. Barnes and Lacey Laughlin, both of Detroit, Mich., for defendant.

TUTTLE, District Judge.

The bill charges infringement of the Pescatore patent, No. 1,084,820, granted July 20, 1914, on an application filed July 6, 1911. The answer sets up the usual defenses of invalidity and noninfringement.

This patent has to do with means for connecting a trailer to a tractor. The particular means shown in the patent and relied upon in its claims is an upwardly inclined part of the back of the tractor which, when backed into the truck or trailer, will raise the front of the trailer and automatically fasten the trailer to the tractor.

The claim particularly relied upon by plaintiff is the sixth and last of the claims in the patent. It reads as follows:

"The combination of a wheeled truck, and a tractor having at one end an upwardly inclined section adapted to be moved beneath and detachably connected with one end of the truck and during such movement to coupling position lift the truck wheels adjacent said engaged end from the ground whereby

the weight of the truck and load will be borne by the other truck wheels and the tractor."

This method and arrangement accomplish the desirable result of placing a portion of the load of the trailer on the rear of the tractor, thereby increasing the traction or road friction of the driving wheels of the tractor. As the load on the trailer increases, greater traction is required and the increasing load thrown on the back part of the tractor by the trailer automatically increases the traction correspondingly to the load of the trailer.

The arrangement claimed also furnishes an easy means by which the driver of the tractor can connect his tractor with his truck or trailer, and adapts itself to the fifth wheel construction which is so necessary in all steerable vehicles having more than one set of wheels. Its utility is such that it has come to be generally used in present day tractor-trailer construction.

As we come to decide whether or not claim 6 covering this useful, valuable, and helpful feature of tractors has been anticipated, and to determine what part of it was new at the time of the application for the patent thereon, we are met at the outset with the problem as to just where to look for references and just what to consider.

I sometimes think that the use of the word "art" causes more confusion and more trouble than it avoids.

Not many arts are bounded by fixed exact lines like those which bound real estate. Their boundaries are not only rather uncertain and indefinite, but one art often overlaps another. One day, for instance, we may be dealing with automobiles and discuss the automobile art. The next day we may be dealing with gas engines and we talk about the gas engine art. These two arts overlap. The gas engine has found its way into the automobile art, the airplane art, motorboat art, and many other places.

Some things are of such common use that they do not belong to any particular art. The general use, for instance, of hammers, nails, and saws is so old that we do not call them an art at all, for we find them in almost every art.

In one case relating to a particular structure, a decision that two arts are so closely related that an idea may be brought from one to the other without invention may be entirely correct, and yet, in another case as to some other subject-matter, the conditions in two arts may be so different that an opposite holding may be required and the decisions in the two cases will not necessarily conflict at all.

For example, the engine of an automobile and that of an airplane may be so close that the transfer of an expedient from one to the other may well be perfectly obvious. The body of an airplane and that of an automobile are sufficiently different as to raise serious questions, whereas the wing of an airplane is thoroughly remote from anything in other fields of transportation. Perhaps the most analogous structure is the curved wings of railroad snowplows, yet we would hesitate to deny invention to one who successfully employed a snowplow wing on an airplane simply because it came from the broad field of transportation.

In determining whether a patent really displays ingenuity, whether the patentee gave the world something worth while, we should measure how big a load he carried and how far he carried it rather than inquire as to the technical boundaries of the "art" in which he worked. Under some definitions, the very art in which he worked may be of such magnitude that the distance between its divisions is very great, while under other definitions, the different parts of quite separate arts may be very close together.

We may use the term "transportation art" and include steamboats, airplanes, wagons, carriages, carts, sleighs, automobiles, trucks and trailers, steam and electric trains, horse-drawn street cars, dog carts and dog sleds. This term covers every means of commercial transportation. Such terms do not help very much.

In weighing the patentee's achievement, we must also consider how difficult it is to find his principles, whether they did exist or not and whether they could all be found in one place.

Even though one must go some distance to get the things he needs, if they are all found together and can be carried home in one basket, they do not count for so much when weighed on the scales of justice as if one thing is found in one place, another thing in another place, and they must be brought in separately and assembled. There is difficulty in that and credit should be awarded for it.

It would not be much of a stretch of the imagination to call the great motor vehicle art, born and developed in the lifetime of all of us, an art by itself. Certain things

were largely appropriated from other arts, but whether it be the body or the top or the wheels or the engine or some other part, their adaptation required a good deal of skill in addition to the mere idea of a self-propelled vehicle. We can trace the origin of some of these parts. The dash and top were at first taken almost bodily from the old buggy and the wheels from the old wagon, yet it has taken much real ingenuity to adapt these old things to automobile use.

Some automobile practice was undoubtedly taken from the railroad. I do not know, again, whether it is fair to call these different arts or branches of the transportation art and it does not matter what we call them. We should not start with that sort of a division of things and try arbitrarily to place things in one art or another separated by rigid lines. When we do, we simply cause confusion, and, to the extent we succeed in the effort, we are likely to do injustice. I do not think that, on the whole, the motor vehicle art got very much from the railroad art. I do not think automobile engineers went there very much. The automobile was in many respects like the airplane—a wonderful new field, although it drew some parts from other transportation fields, from the engine building factories, and indeed went everywhere in the mechanical world to get its necessary parts and operations.

But merely because it has to do with transportation, it does not follow that the railroad is an art closely allied to motor vehicles. The automobile or truck art, as we know it, deals with vehicles that travel on the highway and it does not seem to have copied many of the things used by railroads.

In this suit, we are concerned with a part employed in connecting two vehicles together. Perhaps one would naturally look for such a structure in the various means of transportation where things have been connected together, such as the steamboat with its tow, the railroads with their trains of cars, horse-drawn vehicles connected together, and, at the date of the invention in suit, motor-driven road and farm vehicles drawn one behind the other.

It seems to me that the new type of transportation, where there was no track as in the railroad, no water as with steamboats, no horses as with farm vehicles, but, instead, motor-driven tractors and trailers operating on highways, furnished a new field, when it came to connecting the vehicles. Looking as best I can in all the world of mechanics,

and particularly at what had been done in the transportation branch, this seems like a pretty open field at the time of this patent. Things had to be carried quite a distance, many things had to be carried, and things of considerable importance.

In doing this weighing and measuring, it must be conceded that it was well known that if it was desired to tow a four-wheeled vehicle on land behind another vehicle, a part of the weight of the rear vehicle could be shifted to the front vehicle by lifting the front of the rear vehicle and letting it rest on the back of the vehicle ahead. The patentee must be charged with that knowledge.

That this shifting of weight might be useful in increasing the friction of the driving wheels of the forward vehicle was known, but that this principle was ever used in a practical commercial way is not so apparent. The problem of finding the principle was difficult, for the principle was hidden away in patents which, while public, have a different effect in charging the mechanical knowledge of their contents than would a general and successful use of the principle.

This record discloses, prior to the patent in suit, no actual or commercial use of a trailer vehicle, the transfer of a part of the load of which to a towing vehicle helped its use.

In the railroad field, we have the Spangler patent of 1871 and a British patent of about the same date showing part of the weight of the car borne by the engine head. While the seed of this mechanical principle was then planted in the railroad field, it never took root nor grew, for it was planted on barren soil not adapted to it. It just died.

The great railroad transportation world did not need this principle. This conclusively appears by the fact that these many years later, the railroad is not using it. Although the thought was made known to the mechanical world, there never was a car or train operated that employed it and today trains of cars are pulled with one car coupled behind the other in the old way, and with no part of the load of one car on the car ahead.

Hence, as a matter of equity and fairness, aside from any technical rules of law, even if one had actually found the patent and read it and brought the idea from the railroad art to the highway art where it was needed and useful, he is entitled to more credit than he would be had he found the idea in the railroad art fully developed and in practical use helping that industry.

Carrying over an idea which had failed in its own field to a useful service in a new field should be looked at and weighed in a different way from carrying over an idea which was already in general and successful use.

As shown above, the fact that two arts run close together as to some things does not mean that they necessarily do as to others. The idea here considered was absolutely useless in the railroad field and yet it is the lifeblood of the tractor-trailer field. That a given idea succeeds in one field after failing in another is plain evidence that, as to this idea, the fields are remote.

The railroad and the highway may at places run side by side, yet in other places be so far apart and their soil so different that an idea will sprout and grow in the one field of transportation and not in the other.

What I have said about the general principle of the transfer of load to the power-driven car I repeat about the incline for accomplishing the transfer. We do not find the incline in the practical railroad art because, classified as to its need for this feature, it is a different and distant art. The slanting surface by which to get the rear car onto the back of the locomotive ahead meant nothing to the railroad, and yet is highly useful in tractor-trailer combinations.

There were farm implements like hay loaders where the weight of the towed vehicle was partially borne by the vehicle ahead. While the structure was helpful in the desider service, the principle of increasing traction by the transfer of load was not involved, for then vehicles were horse drawn and had no traction wheels.

While the idea of a structure resembling that under examination sprouted and grew in the farm implement field, it was not at all because of the principle of transfer of load. That was entirely unnecessary. Hay loader couplers with their slanting guides afford a handy way to drag the hay loader behind the wagon but there was no effort or reason to transfer load. On the contrary, the hay loaders were nearly balanced but with a little extra weight forward so that the hay loader would tilt forward instead of backward merely because it was easier to support it in this position when detached and not in use. The new function is evidence of the remoteness of the old use.

Following the discussion further, I note that while the various mechanical elements were known in these remote fields, they were not all to be found in one place. The idea that you could transfer weight to the driving wheels of the forward tractor, that you could lift the forward wheels of the rear vehicle when you were traveling, that you could use forward wheels instead of struts on the rear vehicle, that an incline could be used to elevate the load—these were not all found in one place.

The structural differences are not great. Yet in the railroad train shown in the Spangler patent, for instance, the weight of the truck was not carried at the rear of the locomotive because that was not needed. Indeed, there is no such need in the railroad field now. In adapting the idea to the automotive art, the patentee, among other things, moved the point of trailer support farther back on the tractor so that all the transferred weight of the trailer was carried by the driving wheels. I would not say that alone was invention, and I do not decide the case on that theory, although it is an element to be considered in weighing the patentee's achievement.

My decision is based on the fact that in the tractor-trailer field, this idea was needed and useful and valuable and has been a really helpful thing, and that these various things from the mechanical world and from the other fields of transportation were gathered together and brought into this field and were here assembled in this useful, helpful way. One who accomplished that went beyond what the mechanic skilled in building trailers and tractors could be excepted to do. A man who would do this and could do it and did do it made an invention.

Hence claim 6 must be held valid. It is clearly infringed. It not only reads plainly on both defendant's structures complained of, but these structures employ just the thing that Pescatore disclosed as his invention.

Claims 3 and 4 include some features not employed by defendant and are not infringed.

Claims 1, 2, and 5 are plainly functional in form and could be saved only by interpreting each functionally defined element as meaning the corresponding structural part of the specific device illustrated and its fair mechanical equivalents. When these claims are so interpreted, they contain no inventive thought not fully, adequately, and properly set forth in claim 6. If these claims mean more than claim 6, they are plainly void and under settled principles they

should not be interpreted as covering the same breadth and scope of invention. Under these conditions, it is necessary to hold claims 1, 2, and 5 void as functional claims.

The usual decree for injunction, and reference to compute damages and loss of profits with reference to claim 6, will be entered.