## TERNSTEDT MFG. CO. et al. v. MOTOR PRODUCTS CORPORATION.

### No. 8272.

District Court, E. D. Michigan, S. D.

Nov. 25, 1939.

John H. Bruninga, of St. Louis, Mo., and Alexander F. Baillio, of Detroit, Mich., for plaintiffs.

Merrill E. Clark, of New York City, and J. King Harness and William H. Gross, both of Detroit, Mich. (Sherwin A. Hill, of Detroit, Mich., of counsel), for defendants.

TUTTLE, District Judge.

This lawsuit has to do with two patents, one the reissue patent, number 18866, June 13, 1933, to Wright, and the other patent number 2048605 issued July 21, 1936, to Fisher. Claims 1, 8, 10, 11, 15, 16 and 19 of the Wright patent are declared upon. Claim 10 is typical.[1] All five claims of the Fisher patent are in suit. Claim 1 is typical.[2]

These patents purport to cover the so-called "no draft" or "individually control-

[1] Patent to Wright, No. 18866, June 13, 1933—

Claim 10. A window for a vehicle body comprising a window casing having a well in the lower portion thereof, a transparent panel mounted to slide vertically in said casing and well and adapted to close a portion of the window opening, a second transparent panel pivotally mounted on an up and down axis in said casing adjacent the window opening and swingable to cooperate with said sliding panel in closing said window opening.

[2] Patent to Fisher, No. 2048605, July 21, 1936—

Claim 1. In a vehicle body, the combination with a closed body-wall structure including a window opening and well therebelow, of a panel supported in the front of the window opening on pivots to swing on an up and down axis substantially forward of the midpoint of the widest portion of the panel to provide a substantially major area of the panel to the rear of the pivot, means by which the panel is prevented from turning front edge outwardly and the rear edge inwardly from closed position, the said panel being adjustable on said pivots to bring the rear section outwardly and held against undesired actuation in any of numerous angular positions up to substantially 90° (measured on an arc to the rear of said panel axis) or more to the longitudinal center line of the car, and an upwardly and downwardly adjustable rear panel complementing said front panel and adapted to fill the space left in said window opening when the front panel is in closed position thereby forming a composite window opening closure.

led" ventilating window arrangements that are now largely used on closed automobile bodies. In accordance with these arrangements each front window of the car is customarily divided vertically into two panels—a rear one which slides up and down in the conventional manner, and a forward one which is pivoted about an intermediate vertical axis.

The Wright patent, the earlier of the two in suit, discloses an arrangement of this general character, but with the forward panel hinged at its front edge to the window casing. The Fisher patent shows the front panel pivoted about an intermediate axis.

■ I could discuss at length what happened in the Patent Office between the time when the original petition was filed in the Wright patent and the final claims were allowed, and between the time the petition was filed in the Fisher case and the claims were allowed. However, for the purposes of this opinion it is unnecessary for me to consider those things. I shall proceed upon the assumption that each of the patents in suit is entitled to the usual presumption of validity that flows from the grant.

■ The claims in issue of both patents are for combinations of elements. I am convinced that the ventilating arrangement involved in this case is a fine thing on an automobile. I think highly of it. So the combinations claimed are, in my opinion, definitely useful. But they must be more than that in order that the claims may be sustained. They must be new in the inventive sense. And because I am convinced that they are not, I hold that the claims in suit of both patents are invalid.

Like many other things that have now become standard equipment on automobiles, the ventilating arrangements involved in this case stem directly from accessories which grew in popularity until the automobile manufacturers considered it desirable to build them into the cars, as standard equipment.

Wind wings as accessories for closed automobiles date back at least to 1924 (Motor Vehicle Monthly of October 1924), which is before Wright's application. Being merely an accessory, each of these wings was necessarily pivoted to the window casing outside of the front portion of the conventional vertically slidable panel, and therefore could not be utilized when that panel was closed. But when that panel was open, the accessory wing had all of the functions that the present day built-in wing has when its companion sliding panel is open.

Plaintiff, General Motors, appears to have been the first American automobile manufacturer to build in these wind wings as standard equipment. In doing so, it followed directly the teachings of the prior art.

Concerning the extensive use of built-in wind wings that followed General Motors' adoption of them as standard equipment, the very fact of that standardization by General Motors itself accounts for a great number of units. And since it was a good thing, the other manufacturers naturally followed suit. It is a situation similar to that which followed the building in, and standardization of, automatic windshield wipers, for example. All manufacturers followed the leader (whoever he was) in the standardization of that useful adjunct, and as a result millions of them went into use, in the built-in form.

Preliminary to discussing the prior art, I should point out that I think plaintiff has rather overstressed the scientific aspects of the various structures which have been considered in this case. One can readily describe in lengthy and scientific terminology what happens when a man stands behind an oak tree to keep out of the wind or rain, or when he holds an umbrella in various positions to protect himself from the elements. But no man who finds protection from the elements by standing behind an oak tree, or by holding an umbrella in an effective position, needs to know about, or to think about, the scientific principles involved. Similarly, the patentees of the patents in suit were not thinking of their wind wings along any such scientific lines as plaintiffs suggest. Nor do passengers in cars equipped with such wind wings think of them in any such way. They are primarily means for stopping in-rushing drafts, just as they were when they were added originally to the windshields of open cars, and, indeed, just as the windshields themselves were when they were added to open cars, first as accessories and then as standard equipment.

Of the prior disclosures relied upon by defendant against the Wright patent, I shall consider first the Fennerty patent, No. 333,620, January 5, 1886. I think Fen-

nerty and Wright are about as near alike as two peas in a pod. In each there is a window divided vertically into two panels, a rear panel slidable up and down in conventional manner, and a forward hinged panel, or wing, hinged at its forward edge to the window casing.

It is true that Fennerty's rear panel is opened by being raised into a well above the window, whereas Wright's rear panel is opened by being lowered into a well below the window. But I attach no importance whatever to this distinction. In Fennerty's time some railroad cars were provided with window wells below the windows so that the windows opened downwardly. See, for example, the British patent to Tettweiler No. 8,741 of 1886. But the more common arrangement in railroad cars and the one present in the particular car to which Fennerty applied the construction here in controversy had the wells above the windows so that the windows opened upwardly. So Fennerty naturally used the available wells, and provided for raising the sliding panels into those wells for opening them. On the other hand, in the conventional closed automobile body of Wright's time, to which Wright applied the same construction, the wells were below the windows. Accordingly, Wright naturally used the available wells, and provided for lowering the sliding panels into those wells for opening. Indeed, in such a vehicle body, it was out of the question for Wright to arrange the sliding panels to open upwardly, or in any direction other than downwardly. So I give him no credit at all for the fact that he arranged them to open downwardly, in accordance with standard practice in bodies of that kind.

I do not overlook the fact that where the sliding window is arranged to open by being raised, a partial opening lets the draft in at the bottom, whereas, where it is arranged to open by being lowered, a partial opening lets the draft in at the top. But the principle is the same. Plaintiffs' contention that there is an advantage in letting the draft in at the top upon partial opening may be dismissed with the statement that, if there is any such advantage, it is too trifling to be considered. Certainly, Wright never thought about it, or said anything about it in his patent or to the Patent Office. What plaintiffs now say about it is apparently an afterthought.

So I want it clearly understood that I think Fennerty is just exactly as good prior art against Wright as it would have been if the sliding panel had opened downwardly instead of upwardly.

Similarly, I place no importance on the fact that Fennerty applied the construction to a closed railroad car body rather than to a closed automobile body. They are both closed vehicle bodies which move at relatively high speed, and the problem of letting air in and out without subjecting the passengers to undesired drafts is the same in both. The situation is quite different in this respect than it was in the case of Lapeer Trailer Corporation v. Fruehauf Trailer Co., D.C., 50 F.2d 634, where this Court was dealing with couplings between vehicles.

The Fennerty construction is exactly like the Wright construction and performs exactly the same function. There is no invention in applying the Fennerty construction to an automobile body as Wright has done.

In so stating I am not unmindful of plaintiffs' contention that the window construction in question has a little different job to do when contiguous to a windshield or its equivalent, than it has when applied to a window farther to the rear of a vehicle. I cannot see that this makes the slightest difference because that construction, whether you call it Wright's or Fennerty's, is capable of handling either job equally well. It may be used with equal success in either a front or a rear window, in either an automobile or a railroad vehicle.

I turn now to other prior structures relied upon by defendant against the Wright patent.

The Anibal patent No. 1,542,595, June 16, 1925, shows the forward window, i. e., the front door window, of a closed automobile body divided vertically just as Wright's is to provide a rear slidable panel and a front panel. Anibal's front panel is stationary, instead of being hinged at its front edge as in the Fennerty and Wright structures. But a comparison of these three structures emphasizes how slight was the step taken by Wright, in transferring the Fennerty construction to the particular environment in which he was interested.

The British patent to Edge, No. 216,283 of 1924, for a convertible automobile, em-

phasizes still further the lack of invention in the Wright construction. In Fig. 4, Edge shows a front door like Anibal's with the rear panel of the window slidable and the forward panel fixed. And in Fig. 3, Edge shows the same front panel hinged at its front edge, though in that particular figure, the front panel is not carried by the door. The patent says nothing about the hinging of this panel being for purposes of ventilation. It may well have been for the purpose of making it easier to get into and out of the car. But just such hinged panels had previously been used in automobiles as wind wings. And the Wright claims come pretty close to reading directly on this Edge construction. So the Edge patent must be considered as a path leading to the standardization of wind wings on automobiles.

The article in Autobody for February, 1922, entitled "Development of the California Top", is, in my opinion, a complete anticipation of everything that is substantial in the Wright patent and in the Wright claims. This article discloses an automobile body which has been enclosed by the addition of a so-called California top. As in the Wright patent, the front window of this car is divided into two panels, a rear panel which is slidable and a forward panel which is hinged at its front edge to provide an adjustable wind deflector. It is true that because this car was equipped with an open body enclosed by a California top instead of being equipped with a conventional closed body, all of its sliding window panels, including those forming the rear portions of the front windows, had to be slid horizontally to open and close them, instead of vertically, as in Wright, for there were no wells into which they could be moved vertically. For that reason, even to-day, the only way a construction of the character here in controversy could be applied to an open car equipped with a California top would be by continuing to slide the sliding panels horizontally. Any mechanic half skilled in the art would know that, and by the same token, he would know also that in transferring that construction from a car with a California top to a conventional closed car, the slidable panels should be caused to slide vertically in and out of the conventional window wells.

Just as plaintiffs contended in comparing Wright and Fennerty that there was some advantage, from a highly technical ventilation standpoint, in having the sliding panels open downwardly instead of upwardly, so they contend, in comparing Wright with this California top construction, there is a similar advantage in having them open downwardly instead of horizontally. For the reasons given above, I am not in the least impressed by this contention.

So, as I have said, I find the California top construction described in this Autobody article of February, 1922, to be a complete anticipation of everything of substance that is described and claimed in the Wright patent. Every principle that Wright had in mind when he made his supposed invention was involved identically in this California top construction.

What I have said about this particular California top construction is equally applicable to the generally similar construction involved in the Stafford prior use. I find that Stafford actually used the construction described by him and illustrated in the photographs, Defendant's Stafford Exhibits Nos. 1, 2 and 3; and that he used it when he said he did and in the manner and for the purpose described by him. The pivoted panels themselves are exemplified by the physical structure, Defendant's Stafford Exhibit No. 4.

■ I hold all of the claims in suit of the Wright reissue patent to be invalid.

■ I turn now to the Fisher patent, which is said to represent an improvement over Wright. This improvement is said to consist in discovering the particular place where the swinging panel could be pivoted most advantageously. Whereas Wright disclosed only the hinging of the panel along its front edge, Fisher disclosed pivoting it on an axis located rearwardly of the front edge, but in such a place that the major portion of the panel was behind the axis.

There was absolutely nothing new in this disclosure of Fisher's. It had been conventional for years to pivot the accessory wind wings exactly as disclosed by Fisher, and with the capability of being moved into the "scoop" position. And the very accessory wind wings that plaintiff, General Motors, was supplying in large numbers with its Buick cars at the time of Fisher's invention (see Plaintiffs' Exhibit 56), were substantially identical in

size, shape and point of pivoting with the wings disclosed in the Fisher patent. Fisher did nothing more than to take the current wind wings, without change, and build them into the body as standard equipment, just as Wright had built in his wind wings years before, namely, by substituting them for the front portion of the conventional slidable windows, thus avoiding the use of a double thickness of glass where a single thickness would do.

Another illustration, prior to Fisher, of building in wind wings in the way in which Fisher did it, is found in "The Motor" of October 21, 1930, the car illustrated being a Rolls-Royce enclosed-drive limousine by H. J. Mulliner.

So I find the Fisher patent completely devoid of invention.

An interesting commentary on this Fisher patent is afforded by the testimony of Simpson, who was a subordinate of Fisher's and who originally, and in advance of Fisher's application, applied in his own name for a patent on what is now asserted to be Fisher's invention. Simpson's testimony was that Fisher's sole inventive act was in looking at a structure in which a wind wing was placed outside of the conventional sliding window of a closed car and in commenting to Simpson, "Why put two glasses in when one would do the trick just as well." Simpson then proceeded to eliminate the extra thickness of glass, just as Wright and Mulliner had done, i. e., by removing the portion of the sliding panel that was overlaid by the wind wing, and building in the wind wing in its place. Simpson applied for a patent on the resulting structure, claiming both the broad idea and the structural details. Some months later, on the strength of the comment by Fisher, which I have quoted above, the Fisher application was filed, and Simpson disclaimed from his application everything but the minor structural details which he had devised.

This brief history of the Fisher application emphasizes the complete lack of merit in plaintiffs' contention that Fisher invented an improved point of pivoting for the Wright wings. He did nothing of the sort.

There will be a decree dismissing the bill, with costs to the defendant.